The Deputy Commissioner denied the claim of the plaintiff for injury to his left knee, even though the accident was suffered in the course of his employment. The Deputy Commissioner determined that the injury did not arise out of the course of his employment when plaintiff fell in the course of a foot race with a suspected thief and fell in a concrete walkway. The Deputy Commissioner found that the injury was due to the employee's idiopathic condition because of the underlying inherent weakness of his left knee resulting in the same knee giving way and him falling and injuring the same.
Plaintiff has set forth sufficient grounds to review the evidence, to reconsider the evidence, and to REVERSE the decision of the Deputy Commissioner as herein set forth.
This matter was heard, in part, by the Deputy Commissioner on April 29, 1994 in New Bern, North Carolina. By subsequent order thereof the parties were allowed a reasonable period of time to obtain, either by deposition at defendant's expense or additional stipulated report, the medical evidence necessary to complete the record and has since not only deposed plaintiff's treating physician, Dr. Robert C. Blair, Jr., but were allowed an opportunity to submit statements of contentions, and thereafter the matter was ready for appropriate disposition by the Deputy Commissioner.
* * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties as
STIPULATIONS
1. At the time in question the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employment relationship existed between plaintiff-employee and defendant-employer.
3. Defendant-employer was a qualified self-insured, whose claims were administered by the above-named servicing agent, GAB Business Services, Inc.
4. An Industrial Commission Form 22 Wage Chart indicating a Statement of Days Worked and Earnings of an Injured Employee dated October 21, 1993 and prepared by defendant-employer.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission makes the following
FINDINGS OF FACT
1. Plaintiff was a 28-year-old married male who obtained a GED or high school equivalency certificate after his discharge from the Marine Corps as well as a basic law enforcement training course and has been a certified law enforcement officer since July 8, 1987.
2. In 1988 he became employed as a police officer by defendant City of New Bern and at the time of his May 15, 1993 left knee injury was a patrol officer responsible for patrolling, answering calls and complaints, and investigating traffic accidents. On many occasions as a part of the same duties, was required to engage in foot pursuit as he was when injured as well as to work at night.
3. In 1985 while still in the Marine Corps, plaintiff initially injured his left knee when he fell into a culvert resulting in him twice undergoing knee surgery. Although the exact nature and extent of the same surgeries are unknown as are the condition or conditions for which they were done. According to plaintiff, the initial surgery involved an exploratory arthroscopy because of the possibility of an injury to his medial collateral ligament, but this was never confirmed. A year later plaintiff underwent a patella realignment, the further reason for which is unknown and inadequate evidence appears in the record to determine the cause of same. Regardless of the nature and extent of either surgery or the condition or conditions for which they were done, plaintiff had undergone some kind of major open knee surgery as indicated by the huge surgical scar on the lateral aspect of his left knee.
4. As a result of his earlier knee injury and the knee surgery he has undergone, plaintiff had developed a knee plica which is a fold in the lining of the knee, as well as medial scarring or adhesions in the same knee, both of which pre-existed the involved injury of May 15, 1993. Either was capable of causing the knee to give way and causing him to fall as he did similarly on the date in question. There is also at least an equal likelihood that as the result of his earlier knee injury and corrective surgery or the surgeries necessitated thereby, that plaintiff had existing chondromalacia when he fell, which is similarly capable of causing the knee to give way and him to fall of he did on May 15, 1993. Chondromalacia itself involves changes to the joint surface of the patella and can be caused by trauma, subluxation, damage from prior surgery or anything that traumatizes the knee and in some cases just wear and tear such as in the elderly or people who play a lot of basketball or sports or do a lot of running or jumping or the like.
Although there were several explainable possible causes as to why plaintiff fell on May 15, 1993, he had never done so before this instance. However, he had injured his knee in May 1989 when his patrol car was broadsided by another vehicle that ran a stop light, resulting in plaintiff developing patellar tendonitis requiring six weeks of medical treatment.
5. As part of his duly assigned ordinary employment duties as a patrol officer on the night of May 15, 1993, plaintiff answered a breaking and entering call at a low income housing project in New Bern requiring he engage in foot pursuit of a fleeing suspect as he had done many times before while employed as a police officer.
6. As he was running on a sidewalk adjacent to grass along the same path in a particular housing project chasing an escaping breaking and entering suspect, plaintiff fell and injured his knee. Plaintiff explains this event in the following manner (transcript of evidence — page 9, line 7):
Q. What happened?
 A. Sergeant Allen points in the direction that the man is running.
Q. Could you see somebody?
 A. I was closer to — I was — Sergeant Allen — I was between the two of them. I took off running after him.
Q. Could you see the man running?
A. Yes, sir, I could.
 Q. Could you tell what he — what kind of man it was or anything?
 A. I — all I could see was a black male in black — in dark clothing. I can't say black.
Q. What happened then?
 A. I ran after him. He kind of zigzagged around a courtyard which is between the two — the two apartments. I chased him through there. Then he had a left and went up toward the "A-2" Building — the new section which is off of the loop off of Burns Street. Run up along the chain link fence which divides Trent Court from Tryon Palace parking lot. He ran up the stairs. I went after him.
Q. Is there a set of stairs there?
A. Yes, there is.
Q. What kind of stairs are they?
A. I believe they're concrete.
Q. Is this outside stairs?
A. Yes, sir.
Q. Is there a —
A. It leads from —
Q. — sidewalk there, Tom?
A. — one level —
Q. Is there a sidewalk there at all?
A. Yes, sir, there is.
 Q. Were you running on or off the sidewalk at the time you went up those stairs?
 A. On — on the sidewalk, up the stairs, back onto the sidewalk, and then I turned left. The man I was chasing went left; I went — I turned left, also.
 Q. When you turned left and still were chasing him, was there sidewalk there that you turned left on? Tell me what the ground was like there?
 A. There's a — chain link fence runs down pretty much parallel to the parking lot. And there's a grassy area, sidewalk, small section of grass — maybe twelve inches — and then there's the curb and the parking lot with — there were some cars there that night — or that morning.
 Q. What happened when you turned left after you ran up the stairs chasing this guy?
 A. I turned left. I remember having just enough distance to get up back up to what I considered full speed and I went down.
Q. How did you go down?
 A. I remember tumbling in the air, seeing fence, sky, cars, sidewalk. And much more than that, I didn't recall.
Q. When you fell down, did you hit anything when you fell?
 A. I hit grass and sidewalk. I rolled, I hit the fence, and then as I rolled back, I hit the — I hit a front bumper of a car before I stopped.
Q. What is the next thing that happened to you?
 A. I realized that my knee had done out. I looked down at it, saw that my kneecap was off to the left. I tried to straighten my leg out and push my kneecap back.
 THE COURT: For the record, which knee?
WITNESS: My left knee, sir.
Plaintiff described further that he pushed on his knee and popped it back in place, straightened his leg out, and got back up to see where the suspect was going. He got into the sergeant's vehicle and attempted to chase the suspect in the sergeant's car.
It appears rather clear that had plaintiff's kneecap given way causing his fall he would have felt the pain in his knee before he ever hit the ground.
Upon reflection, plaintiff testified pursuant to a question from his attorney (transcript — page 20) as follows:
 Q. Tell me for the record what you believe caused you to fall?
 A. The best I can figure is I stepped half on the grass, half on the sidewalk and twisted my foot, which made my knee go out.
 Q. When you fell, tell the judge whether or not — tell him how you fell? I mean, how hard you fell and in what direction you went?
 A. I kept going in the direction I was running. As far as how hard, the adrenaline was so high, I just remember hitting different things. As far as how hard, I — I mean, I probably went up in the air a good, maybe, two and a half, three feet. Exactly how hard, I don't know."
After this incident occurred and plaintiff was able to terminate the chase with his sergeant, he proceeded to begin medical care and eventually had surgery by Dr. Blair. He was out for seven to ten days following surgery and returned to light duty status doing desk work, taking walk-in complaints, and so forth (transcript — page 14).
Plaintiff emphasized upon questioning that his knee had never given out in a manner so as to duplicate what occurred on the event resulting in this case.
Plaintiff spent four years in the Marine Corps and received an honorable discharge in March 1980. The knee problem had nothing to do with the discharge and he did not accept a medical discharge.
7. Plaintiff injured his left knee as above described while in the course of his employment and the same arose out of his employment and not as some idiopathic diagnosis as speculated upon by defendants.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission makes the following
CONCLUSION OF LAW
On May 15, 1993 plaintiff sustained an injury by accident in the course of his employment which arose out of his employment and resulted in the disabling left knee condition for which compensation is claimed.
The Conclusion of Law drawn by the Deputy Commissioner at the hearing on this matter is THEREFORE REVERSED.
A review of the record could reflect no evidence in the transcript of hearing, the deposition testimony or medical records which unequivocally supports the trial judges "Finding of Fact" that the plaintiff's left knee injury did not arise out of employment, but rather was idiopathic in nature due to the inherent weakness of the left knee resulting in the knee giving way and the plaintiff falling.
Even if there was some causal connection between the idiopathic condition of plaintiff's left knee and the injury which he suffered in this case, the law in the State of North Carolina is that "where the accident and resultant injury arise out of both the idiopathic condition of the workman and hazards incident to the employment, the employer is liable. But not so when the idiopathic condition is the sole cause of the injury." Allred vs.Allred-Gardner Inc., 117 S.E.2d 476, 479, 253 N.C. 554 (1960).
The factual analogies between Allred and this case are quite striking. In this case, however, instead of operating a car as was the case in the Allred case, the plaintiff was running at full speed. Even if, arguendo, the plaintiff's knee went out because of an inherent weakness, the knee failure occurred at a time and place that claimant's duties required him to be running through a low income housing project in the middle of the night after a suspect. Again assuming, arguendo, the plaintiff's inherent weakness in his left knee, it was the combination of his employment and the weakness which produced the accident. Thus, the accident and resultant injury, even when viewed in the light least favorable to the plaintiff, arise out of both the idiopathic condition of the workman and hazards incident to the employment, and so therefore the employer is liable.
Circumstances as described in the full record of this matter, however, make it rather clear that the plaintiff stepped on the edge of the sidewalk where it meets the grass of a different level while running at full speed chasing a suspect. As a result of that unlevel landscape plaintiff tripped and fell as he previously described. He either landed on his knee at the outset or struck it on the bumper of a standing automobile where he came to rest, and thereby injured his knee. Either of these cases would satisfy the requirement that the injury would be arising out of the employment as required under the Act.
Under the facts of this case it is not even necessary to invoke the liberal interpretation rule in favor of the claimant in order to find the defendant liable to the plaintiff.
* * * * * * * * * * *
Based upon all of the foregoing, the Full Commission enters the following
AWARD
1. The award by the Deputy Commissioner in this case is REVERSED.
2. Plaintiff's claim is allowed.
3. The defendant shall pay to the plaintiff such workers' compensation benefits as herein reflected in this order, including temporary total disability during the time he was out of work, and such compensation as he has lost, if any, on the workers' compensation pro rated scale during plaintiff's work in a part-time or limited duty status.
4. Defendant shall continue payments until such time as the plaintiff is cleared to go to full-time employment, or until defendants receive permission from the North Carolina Industrial Commission to discontinue payments.
5. Defendants shall pay all medical bills attached to the injury now in question and shall continue with same until those benefits are no longer applicable. Such funds as are now due and payable shall be paid immediately in lump sum directly to the claimant subject to attorney's fees as hereinafter set forth.
6. A fair and reasonable fee for counsel for the plaintiff in this matter is one-fourth of the accumulated arrearage and continuing with payment of every fourth check of plaintiff to counsel until the same is terminated by order of the Commission.
7. All costs shall be borne by the defendant but shall be deferred pending further proceedings except for the medical bills and the attorney's fees and a reasonable charge for depositions already received in this case.
This the _____ day of __________________________, 1995.
FOR THE FULL COMMISSION
 S/ ____________________________ JAMES J. BOOKER COMMISSIONER
CONCURRING: S/ ____________________________ COY M. VANCE COMMISSIONER
S/ ____________________________ NEILL FULEIHAN DEPUTY COMMISSIONER
JJB:mj 3/21/95